Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Avenue
7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9478

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

LARRY G. PHILPOT,                                    Index No.: 16-cv-1128

                       Plaintiff,                    **COMPLAINT AND JURY DEMAND**
                                      **FOR DAMAGES FOR COPYRIGHT**
              v.                              **INFRINGEMENT**

MLB ADVANCED MEDIA, L.P., FENWAY
SPORTS MANAGEMENT, and EVAN LEPLER,

                      Defendants.
-----------------------------------------------------------------x

      Plaintiff LARRY G. PHILPOT, by and through his attorneys at GARBARINI FITZGERALD

P.C., brings this Complaint and Jury Demand against Defendants MLB ADVANCED MEDIA,

L.P. ("MLBAM")", FENWAY SPORTS MANAGEMENT, and EVAN LEPLER based on

primary and secondary copyright infringement pursuant to the Copyright Act and Copyright

Revisions Act, 17 U.S.C. §§ 101 *et seq.* (the "Copyright Act" or "Act"), and a violation of the

anti-scrubbing provision of the DMCA, 17 U.S.C. § 1202(b).

### <u>NATURE OF THE ACTION</u>

      1.      In 2007, Defendant FENWAY SPORTS MANAGEMENT ("FSM") purchased

the Salem Red Sox (f/k/a Salem Avalanche), a Class-A Advanced Carolina League baseball

franchise.  In or about 2008, Defendant MLBAM consolidated and took control of the major and

minor league baseball websites, including the Salem Red Sox Website and the adjacent Salem

Sox Talk Blog; consolidating them all into one platform.

2.       On or about April 8, 2013, Defendant LEPLER, an employee of FSM, reproduced

Plaintiff's copyrighted photograph of Willie Nelson (the "Nelson Photograph") and, along with

Defendants FSM and MLBAM, displayed, broadcast, or otherwise disseminated the Nelson

Photograph through the Salem Sox Talk Blog (which was at all times owned and/or managed by

Defendant MLBAM).

3.       Defendants not only failed to get a license, but erased all information from the

Nelson Photograph including the name of the Author. This is a clear, and obviously intentional,

infringement of Plaintiff's exclusive rights under the Copyright Act 17 U.S.C. §§ 101 et seq. and

a violation of the DMCA's anti-scrubbing prohibition.

4.       Moreover, the Defendants may not avail themselves of the Safe Harbor Provisions

of § 512 of the DMCA. The Nelson Photograph was reproduced and uploaded either by an

employee of Defendant FSM onto Defendant MLBAM's website, or it was uploaded by

MLBAM onto its own system at the direction of FSM. FSM and its parent company are part

owners of MLBAM. There is no Safe Harbor provision in the DMCA that applies, and MLBAM

does not satisfy the requirements for eligibility as an ISP.

## JURISDICTION AND VENUE

5.       The jurisdiction of this Court is based upon 28 U.S.C. § 1331 in that this

controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C. §

101 et seq.). Alternatively, jurisdiction is conveyed under 28 U.S.C. § 1332 because this matter

involves citizens of different states and involves more than $75,000 in controversy.

6.       Plaintiff has the right to bring the within action pursuant to 17 U.S.C. § 501(b).

7.      The subject photograph was registered with the United States Copyright Office prior to the infringement by Defendants.

8.      Personal jurisdiction over Defendant MLBAM is proper in this Court on the ground that Defendant maintains a headquarters or otherwise resides in New York, NY.

9.      This Court has personal jurisdiction over Defendant MLBAM pursuant to CPLR § 302 (New York's long-arm statute) due to its continuous and systematic business activities within New York as described at length in this Complaint.

10.      This Court has personal jurisdiction over Defendant FSM pursuant to CPLR § 302 (New York's long-arm statute) due to its continuous and systematic business activities within New York. Defendant FSM is an international company with client's that include Jet Blue, Subway Sandwiches, MLBAM, and Dunkin Donuts. Defendant FSM owns the Salem Red Sox, and is merely the marketing arm of Fenway Sports Group, L.P. ("FSG") which owns the Boston Red Sox, among many other things. In October 2009, FSG announced a new partnership with Fulham of the English Premiership, with shirt sponsorship to start in 2011. In April 2011, FSM became the sole marketer of the global rights of NBA superstar LeBron James, in a management partnership deal with James and his manager Maverick Carter. As part of the deal, James and Carter both became minority stake holders in FSG's Liverpool F.C. In January 2014, FSM became the marketer of the global rights of 2012 Heisman Trophy winner and Cleveland Browns quarterback Johnny Manziel, in a management partnership deal with LRMR Management. In February 2015, FSM became an investor in the Pawtucket Red Sox of the Triple-A International League. Each of the national consulting deals for Dunkin Donuts, MLBAM, Jet Blue, Subway, Lebron James, Lohnny Manzel, impact this Judicial District.  FSM is also merely the marketing arm of FSG which own the Boston Red Sox.  As this Court is assuredly aware, the Boston Red

3

Sox generate significant revenue in the Bronx, generally taking beatings from the New York Yankees.

11.     Thus Court has personal jurisdiction over Defendant LEPLER pursuant to CPLR § 302 (New York's long-arm statute) due to his continuous and systematic business activities within New York. LEPLER is the current announcer for the American Ultimate Disc League ("AUDL") and travels to New York to call games for the New York Empire and New York Rumble. LEPLER also records a blog directed at New York and the fans of the New York Empire where he breaks down each New York Empire game.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b) and (c).

13.     A copy of Registration issued by the U.S. Copyright Office is annexed hereto as **Exhibit A.**

## PARTIES

14.     Plaintiff is a well-known photographer and earns a living licensing his photographs to businesses and musicians. Some examples of Plaintiff's customers are AOL, AXS-TV, Berkshire Hathaway, KISS, John Mellencamp, and Willie Nelson.

15.     Plaintiff has photographed hundreds of musical artists in addition to Kid Rock, including Chuck Berry, the Lumineers, REO Speedwagon, Hall and Oates, Norah Jones, John Mellencamp, Ted Nugent, Sir Paul McCartney, Mumford and Sons, Buddy Guy, and countless other top tier artists.

16.     Plaintiff displays his work on his website <www.soundstagephotography.com>, and licenses his work for use by print and electronic publications. His work appears in a number of Wikimedia entries, Rock History Magazine, OnStage Magazine, AXS-TV (owned by Ryan Seacrest and Mark Cuban), Dan Rather

4

Reports, Berkshire Hathaway, and Forbes. Plaintiff's work includes album covers as well as stunning portraiture and performance photographs.

17.     Plaintiff is currently under a two year non-exclusive contract with AXS-TV, and in 2013 was contracted with Tom Petty for a single use of one of his images, and photographed Mr. Petty in both Indianapolis and Milwaukee.

18.     MLB Advanced Media, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 75 Ninth Avenue, New York, New York 10011. Its general partner is MLB Advanced Media, Inc., a Delaware corporation with its principal place of business at 75 Ninth Avenue, New York, New York 10011.

19.     Upon information and belief, Fenway Sports Management is the owner of record of the Salem Red Sox f/k/a Salem Avalanche, and is the marketing and consulting arm of Fenway Sports Group L.P. ("FSG"). FSG is a Delaware corporation with a principal place of business located in Boston, Massachusetts. FSG is the parent corporation of the Boston Red Sox baseball club and is part owner of Defendant MLBAM.

20.     Upon information and belief, Defendant Evan Lepler ("LEPLER") is an individual and resident of Massachusetts.

## FACTS

21.     In or around December 2007, FSM purchased the Salem Avalanche, a Class A-Advanced Carolina League Baseball team and a farm team of the Boston Red Sox located in Salem, Virginia.  The name was then changed from the Salem Avalanche to the Salem Red Sox.

22.     In 2009, Defendant LEPLER was hired by the General Manager of the Salem Red Sox to be the Director of Broadcasting and Media Relations, a position he held until March 2015.

5

23.     Defendant LEPLER's responsibilities as Director of Broadcasting and Media Relations included, inter alia, broadcasting the Salem Red Sox games, and overseeing the publication of the Salem Red Sox daily blog, "Salem Sox Talk", on Defendant MLBAM's MLBlogs Network.

24.     Defendant LEPLER was replaced by Kevin Burke.

25.     The URL for the Salem Sox Talk Blog is <http://salemsox.mlblogs.com/.com>.

### THE INRINGEMENT

26.     On October 4, 2009 Plaintiff took what has become an iconic photograph of entertainer Willie Nelson at his performance in St. Louis, Mo. (the "Nelson Photograph"). The Nelson Photograph is the subject of copyright registration VAu 1-132-411 issued on September 5, 2012.

27.     On or about April 8, 2013, Defendants caused the Nelson Photograph to be uploaded, displayed, and disseminated through MLBAM's Salem Sox Talk Blog.



Infringing Use            Cropped Original

28.     No Defendant ever sought, or obtained a license for the above use which had a URL of <https//salemsox.mlbblogs.com/2013/04/08/here-in-lynchburg-a-hokie-joins-salem. Attached as **Exhibit B**.

29.     The Nelson Photograph was uploaded to MLBAM's Salem Sox Talk Blog by

6

Defendant LEPLER, or by an employee of FSM or MLBAM under LEPLER's by-line.

30.     The Salem Sox Talk Blog is the official blog of the Salem Red Sox.

31.     Defendants uploaded a cropped version of the Nelson Photograph, but failed to notify the public in any manner that it was a derivative or changed version from the original.


### ERIC LEPLER WAS AN EMPLOYEE OF FSM AT THE TIME OF THE INRINGEMENT

32.     Defendants have taken the bizarre position that LEPLER was not an employee of the Salem Red Sox when the infringement took place; this is completely incorrect.

33.     At all times relevant to this Complaint, the Salem Red Sox were owned by FSM and FSG, and LEPLER was an employee, acting within the scope of his employment.

34.     Defendant LEPLER has repeatedly stated in public interviews that he worked for the Salem Red Sox as the Director of Broadcasting and Media Relations from 2009-2015.

35.     In an interview on Firebrandal dated September 12, 2014, LEPLER discussed his role as an employee of the Salem Red Sox at length. See **Exhibit C.** The September 12, 2014 interview took place after the April 2013 infringement.

(http://firebrandal.com/uncategorized/interview-with-evan-lepler.html Last Viewed 2/14/2016)

36.     In an interview with LEPLER in the Roanake News on March 18, 2015, Aaron Mcfarlang reported that LEPLER worked for the Salem Red Sox, and Burke will start working for the Salem Red Sox. LEPLER, in that same article, stated he will miss "Hanging around the front office." See **Exhibit D**. (Something non-employees would never be able to do).

<http://www.roanoke.com/sports/salem_red_sox/salem-red-sox-radio-broadcaster-leaves-for-ultimate-challenge/article_002f4eeb-491c-526e-b32e-d9fdbbc1af7f.html>, Last Viewed on

2/14/2016.

37.    In an April 16, 2014 interview on Fox News, LEPLER stated he took the Salem

Red Sox position in 2009 and the reporter identified LEPLER as "the Director of Media

Relations".  See https://www.youtube.com/watch?v=JuXjeEYdhvM last viewed on 2/13/2016.

38.    On March 29, 2013, the Salem Red Sox stated they were proud to announce

LEPLER would be returning for his fifth year."  See **Exhibit E**.

<http://salemsox.mlblogs.com/2013/03/29/espn-radio-to-broadcast-salem-red-sox-

baseball/> Last Seen on 2/14/2016).

39.    As **Exhibit E** also makes clear, the Salem Red Sox make all of their

announcements over the Salem Talk Blog.  In fact, MLBAM and the Salem Red Sox post

announcements regarding the team on the subject blog, all under the by-line of LEPLER

or Burke.

40.    The official MLB website identified LEPLER as a Broadcaster and Rising Star

for the Salem Red Sox.  See **Exhibit F**

(<http://www.milb.com/content/page.jsp?sid=t414&ymd=20090429&content_id=573094&v

key=roster> last viewed on February 12, 2016.)

41.    LEPLER's farewell post acknowledges that he worked for the Salem Red

Sox. See **Exhibit G** <http://ultiworld.com/livewire/evan-lepler-leaving-baseball-gig-to-focus-

entirely-on-ultimate/> Last Viewed on February 14, 2016.)

42.    LEPLER's 2015 American Ultimate Disc League ("AUDL") profile states:

"LEPLER is also the radio voice of the Salem Red Sox, a class A affiliate of the
Boston Red Sox in Virginia. Throughout the five-month season, he'll call 140
games or more for the team, **where he is also the director of media relations**.
On the weekends, he criss-crosses the country covering games for the AUDL."
See **Exhibit H** < http://theaudl.com/articles/ata/evan> Last Viewed on February

8

14, 2016).

43.     At all times relevant to this complaint, LEPLER could be heard on Salem Sox

Radio as well as streamed over the internet by MLBAM.

44.     Salem Red Sox General Manager Todd Stephenson hired Defendant LEPLER.

45.     Erick Tyler Gallantry's March 18, 2015 resume identified LEPLER as the

Director of Media Relations. See **Exhibit I.** (<

http://www.milb.com/news/article.jsp?ymd=20150323&content_id=114457960&fext=.j

sp&vkey=news_t414&sid=t414> Last Reviewed on February 14, 2016.)

46.     The 2014 Wikipedia page of the team identifies LEPLER as the Broadcaster and

Director of Media Relations.  See **Exhibit J.**  (<

http://wiki.soxprospects.com/page/pdf/salem+red+sox?responseToken=ca170d0bbaf2781e1b0

958f62b2131e6>  Last Viewed on February 14, 2016.)

47.     The August 18, 2014, Roanake Star identifies LEPLER as "Broadcaster

and Director of Media Relations."

48.     In a July 23, 2013 Boston.com article, LEPLER is thanked as follows : Thanks

to Evan Lepler, Salem's director of broadcasting and media relations, for some of this

information.  (<http://www.boston.com/sports/baseball/redsox/extras/extra_bases/2013/07/no-

hit_innings_pile_up_for_salems_henry_owens.html> Last Viewed on February 14, 2016.)

49.     LEPLER, in the Salem Sox Talk Blog, acknowledged he works for the

Salem Red Sox. See **Exhibit K**. (<http://salemsox.mlblogs.com/2013/08/20/promoting-

promotions/>  Last Fiewed on February 14, 2016.)

50.     On March 23, 2015, Major League Baseball issued a press release announcing LEPLER would be replaced by Kevin Burke. See **Exhibit L**. (< http://www.milb.com/news/article.jsp?ymd=20150323&content_id=114457960&fext=.jsp& vkey=pr_l122&sid=l122 last viewed on February 12, 2016>.)

51.     In Burke's opening greeting on the Salem Sox Talk Blob, posted on April 1, 2015, he admits: "my name is Kevin Burke and I'm the new Director of Broadcasting and Media Relations for the Salem Sox." See **Exhibit M**. (<Http://salemsox.mlblogs.com/2015/04/01/so-let-us-begin-anew/>. >.  Last Viewed on February 12, 2014)

52.     Mr. Burke's 2014 resume identifies LEPLER as the "Director of Broadcasting and Media Relations for the Salem Red Sox."  See **Exhibit N**.

53.     **Exhibit N** also shows LEPLER had a Salem Red Sox email and could be reached at the Salem Red Sox offices at a date after the infringement.

54.     The 2015 Salem Red Sox program guide lists Burke as an employee of the Salem Red Sox. See **Exhibit O**. (<http://www.milb.com/documents/0/2/6/114828026/2015_Media_Guide_73xbtd57.pdf>.  Last Viewed on February 12, 2014.)

55.     Kevin Burke openly states on his LikedIn page that he is the current Director of Broadcasting and Media Relations. See **Exhibit P**. (<https://www.linkedin.com/in/kevin-burke-06966442>. >.  Last Viewed on February 12, 2014.)

56.     On March 3, 2015, on MLB.com, Kevin Burke, admitted he was hired to replace LEPLER by Red Sox General Managers Ryan Shelton and Allen Lawrence. See **Exhibit Q**.

10

(<http://www.milb.com/news/article.jsp?ymd=20150323&content_id=114457960&fext=.jsp&

vkey=pr_l122&sid=l122>. >.  Last Viewed on February 14, 2014.)

57.    It is absolutely clear from the forgoing, that Defendant LEPLER was an

employee of FSM at the time of the infringement.


## THE SUBJECT OFFICIAL BLOG WAS AN
## OFFICIAL PRODUCT OF THE SALEM RED SOX

58.    The Salem Sox Talk Blog is the Salem Red Sox's official daily report.

59.    The inaugural post in 2009 stated:

> Welcome Red Sox fans! This is the official Salem Red Sox Blog. This Blog
> will feature exclusive interviews with Salem Red Sox players and staff,
> promotional updates, great insider information on the Salem Red Sox
> ballclub and much more. Very soon I will be adding an interview with
> Carolina League All-Star Reliever Derrick Loop! This Blog will also update
> current Salem Sox fans on when they can expect their next episode of Turf
> Talk w/ Tracy Schneweis. This Blog is for the fans and we want fans to
> voice their opinions on promotions, game experiences, etc. A new Blog will
> be added each Monday and Friday. Questions and Comments are
> appreciated because this Blog is for you Sox fans! See **Exhibit R**.
> (<http://salemsox.mlblogs.com/2009/06/19/salem-red-sox-blog-2009/>.
> Last Viewed on February 14, 2016.)

60.    It is produced by the Salem Red Sox, appears on the MLB.com which is

owned and operated by defendant MLBAM, for the benefit of both MLBAM and FSM.

61.    To be more specific, the Salem Sox Talk Blog is merely the Salem Red Sox

vehicle to post lineups and game reviews. See **Exhibit S**. (http://salemsox.mlblogs.com/ >.

Last Viewed on February 14, 2014.)

62.    At times the Salem Red Sox write the blog directly with no by-line. See **Exhibit

E**.

63.    The Salem Sox Talk Blog itself is surrounded by substantial trademark and

signage of Minor League Baseball, indicating it is a product of the Salem Red Sox.

64.     From the Salem Sox Talk Blog, the user can purchase tickets for the Salem Red Sox, read the Salem Red Sox twitter feed, and read articles from MLB.

65.     Mr. Burke's current resume states that from April 2015 to present, he has functioned as the Director of Broadcasting and Media Relations for the Salem Sox and is responsible for the "***publication of daily blog, Salem Sox Talk, on MLBlogs Network***."  See **Exhibit T**.

66.     The Salem Sox Talk Blog is not some random, unaffiliated publication. It is a direct product of the Salem Red Sox, written by the Director of Broadcasting and Media Relations as a daily public relations message.

67.     It is also owned and/or operated by MLBAM, who is responsible for producing, editing, and uploading the Salem Sox Talk Blog.


**MLBAM**

68.     Major League Baseball's decision to put all of its internet material under a single umbrella at MLB.com's under MLBAM was first conceived in 2000, and was the "start of a focused effort to completely control and centralize all products and services provided on the Internet by MLB." See Maury Brown, MLBAM: The Stealthy Money Machine, Hardball Times (Dec. 5, 2005), http://www.hardballtimes.com/main/article/mlbam-the-stealthy-money-machine/.

69.     MLBAM manages and operates the official Major League Baseball site, <MLB.com>, and each of the official MLB Club sites (e.g., <cubs.com> and <whitesox.com>) to create the most comprehensive Major League Baseball resource on the Internet.

70.     In or about 2008, MLBAM took over the ownership and/or operation of

12

the websites for all 14 domestic Minor League Baseball ("MiLB") leagues totaling 155

Minor League clubs, including the Salem Red Sox, and Salem Sox Talk websites.

71.     MLBAM employs one of the largest staffs in all of sports with over 650

employees who are able to churn out massive amounts of MLB-related content. See Charlie

Rose, Charlie Rose Talks to MLB Advanced Media CEO Bob Bowman, Business Week (July

3, 2013), http://www.businessweek.com/articles/2013-07-03/charlie-rose-talks-to- mlb-

advanced- media-ceo-bob-bowman.

72.     To put it in context, MLBAM produces as much content every month as on-

demand movie streaming company, Netflix, has in its entire streaming archive. Sam

Mamudi, Baseball's digital revolution, Marketwatch.com (Apr. 5, 2012, 1:28 PM),

http://www.marketwatch.com/story/baseballs-digital-revolution-2012-04-05?pagenumber=2.

73.     Between the advancements in products and the sheer volume of content,

MLB.com has developed a loyal following and receives traffic from tens of millions of fans

each month. Id.

74.     By 2011, MLBAM sold more than 35 million MiLB tickets, more than half of

the league's inventory.

75.     "MLBAM has integrated an array of features to the network of MiLB sites since

its initial launch in April 2005, highlighted by live, full-game video streaming and on-demand

highlights, up-to-the-moment scoreboards and statistics, Minor League Beat the Streak fantasy

baseball game, mobile websites, and comprehensive editorial coverage of Minor League All-

Star Games and Playoffs."  MLBAM official statement.

76.     The market value of MLBAM is as high as $6 billion. See Mike Ozanian,

Baseball Team Valuations 2013: Yankees On Top At $2.3 Billion, Forbes.com (Mar. 27,

2013). http://www.forbes.com/sites/mikeozanian/2013/03/27/baseball-team- valuations-2013-yankees- on-top-at-2-3-billion/.

77.     MLBAM selects and reviews all of the webpages on the MLB.com website, including the purported "MiLB Pro Blog" pages.

78.     The MiLB Pro Blogs function as the official daily blog or newsletter for the respective minor league teams. These official minor league team blogs bear names like "The Official Blog of the Hillsboro Hops" of the "Crawdads front Office Blog". There are forty seven MiLB Pro Blogs owned and operated by MLBAM, including "Salem Sox Talk".

79.     This is far short of the 155 MiLB team websites MLBAM owns and/or operates. MLBAM selects, edits, and oversees the production of every Pro Blog, and intends to slowly add more to its network.

80.     All of the MiLB Pro Blogs state that they are the official blog of the respective team (with the exception of the Official Blog for Independent Baseball).

81.     Some MiLB Pro Blogs, like "The Official Blog of the Staten Island Yankees", aren't attributed to any specific individual.  See **Exhibit U**. (<https://statenislandyankees.wordpress.com/2014/12/28/2014-baby-bombers-top-10-no-6-costume-week/>. >.  Last Viewed on February 14, 2014)

82.     As the owner and/or operator of the MiLB Pro Blogs, MLBAM bears responsibility for any infringing content.

83.     MLBAM not only owns and/or operates the forty seven MiLB Pro Blogs. it selects, edits, and unifies the blogs themselves. Each bearing the same look and feel, each bearing all of the MLB and MiLB signage, each selling tickets, and each existing on the MLB.com platform.

14

84.     MLBAM even allows visitors the option to follow the Salem Sox Talk Blog by

email.

85.     In a public statement, MLBAM stated:

> MLBAM, directly and through authorized licensees, has established and
> maintained high standards of quality for MLB Products, and continues to
> maintain stringent quality control over licensees and other authorized users of
> MLB Trademarks.

> In supervising licensees, MLB provides licensees and licensed product
> manufacturers with specifications setting forth extensive details with respect to
> use of MLB Trademarks, including typeface and typography, color renderings,
> official uniform scripts, graphic designs, materials, workmanship, and quality.
> All MLB Products are reviewed under these strict quality control procedures.

> To protect MLB Trademarks from infringement, dilution, disparagement, and
> misappropriation, MLB, in collaboration with CAPS, has established a
> comprehensive program of trademark protection, including regularly
> investigating suspicious websites identified in proactive Internet sweeps and
> reported by consumers. MLBP and MLBAM manage these activities on behalf of
> MLB.

86.     MLBAM manages every aspect of the websites, including the MiLB Pro

Blogs, and maintains strict quality control.

87.     Not only is MLBAM directly liable, it is inconceivable that MLBAM was

not aware, and in approval, of every page on the MLB.com website. Particularly pages that

are surrounded by their "famous" signage.

88.     MLBAM may be directly responsible for uploading the Nelson Photograph to

the Salem Sox Talk page.


**THE DMCA DOES NOT APPLY TO THE SALEM SOX TALK BLOG**

89.     The four safe harbors provided by Congress, in the following subsections of 17

U.S.C. §512 are: (a) Transitory digital network communications; (b) System caching; (c)

15

Information residing on systems or networks at the direction of users; and (d) Information location tools.

90.     These relate to materials posted to a blog or website at the "direction of a user". This could include a file (e.g., a photograph, a film clip, an audio file) that a user posts to a comment section on your site or to a forum thread.

91.     This does not, however, include content directly uploaded by employees of the content provider itself to its own service.  Defendant LEPLER is not a user, he is an employee.

92.     The second area of safe-harbor provisions relate to links posted by a user to other online material located elsewhere. This safe-harbor provision is found in section 512(d), and it states that an online service provider will not be held liable for money damages "for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link." Again, this was not a link posted by a user of the website.

93.     The DMCA does not apply to situations like the one here, where the content provider is responsible for uploading the digital information to its own network. Again,

Defendant LEPLER was an employee of FSM, who, along with its parent FSG, are co-owners of MLBAM.

94.     Axiomatic to DMCA Safe Harbor eligibility is the fact that the transmission of the material was initiated by or at the direction of a person other than the service provider. Here, it was an employee of one of the owners, which vitiates the eligibility under § 512.

16

95.     Further, § 512 eligibility requires the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider. Here, MLBAM has specifically selected the content for inclusion on its Pro Blog system.

96.     Additionally, MLBAM is not eligible for § 512 protection because it maintains the right to modify or edit the Salem Sox Talk page, and, in fact, has edited pages on its system.

97.     In fact, MLBAM informed the Dodgers that their fledgling Video On-Demand channel (Dodgers On Demand) launched with Time Warner on August 9, 2015 violated a 2000 broadcast agreement. A special board that has Bob DuPuy as one of its members ruled against the Dodgers and Time Warner.

98.     As the 2000 agreement reads, clubs have the right to "one-way transmission of radio and television," but MLBAM sees the ability of users to stop, start, fast-forward or rewind the content as "interactive" and therefore, part of the 2000 agreement. As Bob Bowman, President of the MLBAM said, "The board interpreted that user interaction with the content, which is at the heart of what interactivity is, is a two-way communication. The board made the determination that Dodgers on Demand is a two-way communication and therefore interactive."

99.     The DMCA Safe Harbor provisions do not apply to the case at bar.

**Additional Points**

100.     Photography is an art form that may require the photographer to make many important creative decisions.

101.     A photographer, like Plaintiff, is entitled to protection for such artistic elements

as the particular lighting, the resulting skin tone on the subject, and the camera angle that he selected.

102.    The Nelson Photograph took significant maneuvering and skill to obtain.

103.    There were eighty professional photographers invited to, and attending, the Farm Aid show where the Nelson Photograph was taken.

104.    Plaintiff was the only one with the skill to pick the correct part of the stage, lighting, angle, aperture, and timing to be there at the very moment to take what is easily the most widely used photograph of Willie Nelson.

105.    Plaintiff was sponsored by John Mellencamp to go to Farm Aid where he took the Nelson Photograph.

106.    Years of hard work allowed Plaintiff to get access to the most advantageous lighting, angles, and timing.

107.    To create the desired photograph, PHILPOT often has the subject in focus and includes or excludes items or surroundings, such as a microphone stand, and waits for a decisive moment before tripping the shutter. The Nelson Photograph was taken the instant that Mr. Nelson made eye contact with PHILPOT. One second earlier or later, and the image would have been totally different, little more than a snapshot.

108.    Defendants simply copied the Nelson Photograph, removed the attribution, refused to get a license, and intentionally attempted to infringe without consequence.'

109.    The Nelson Photograph was the result of Plaintiff's profound depth of experience in the field.

110.    Defendants used a cropped version of the Nelson Photograph, but did not notify the public in any manner that it was a derivative or changed version from the original.

18

111.    Allowing Defendant to use the Nelson Photograph without a license would substantially harm Plaintiff and reduce the value of a truly iconic photograph to zero.

112.    This type of predatory business tactic must be stopped.

113.    Defendant could not possibly believe there was high probability that their use constituted fair use.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT
### (Against All Defendants)

114.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth at length here.

115.    Defendants have, without license from Plaintiff, reproduced and/or publicly distributed the Nelson Photograph.

116.    It cannot be disputed that Plaintiff has a valid, registered copyright, and that Defendants have reproduced and displayed the Nelson Photograph without a license, thus infringing Plaintiff's rights under the Copyright Act. Irreparable injury is presumed here as Plaintiff has established a prima facie case of copyright infringement.

117.    The making or the distribution, or both, of the Nelson Photograph without attribution or license is actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

118.    Defendant LEPLER either uploaded the photograph or another employee of FSM or MLBAM did under his name.

119.    FSM is liable via Respondeat Superior for the acts of Defendant LEPLER, or anyone who acted on LEPLER's behalf.

120.    Defendant MLBAM is the owner and/or operator of the Salem Sox Talk

Blog, and liable for the acts of FSM and LEPLER, or anyone acting on their behalf.

121.    MLBAM may have been the party responsible for the

122.    Defendants' predatory conduct was clearly intentional within the meaning of 504(c)(2) for purposes of enhancing statutory damages. Defendants knew their actions constituted an infringement or at the very least acted with reckless disregard to Plaintiff's rights.

123.    Defendants' knowledge and intent may be inferred from its conduct including the reckless disregard of Plaintiffs' right (rather than actual knowledge of infringement), which suffices to warrant award of the enhanced damages.

124.    As a direct and proximate result of each of the Defendants' infringement, Plaintiff has incurred actual damages in the form of license fees while Defendants have used Plaintiff's Copyrighted Photographs for their own commercial gain in an amount that will be determined at trial. Plaintiff may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each infringement of each copyright registration identified in **Exhibit A**, as available under the law.

## SECOND CLAIM FOR RELIEF
## VICARIOUS COPYRIGHT INFRINGEMENT
### (Against MLBAM)

125.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth at length here.

126.    Defendants MLBAM and/or FSM had the right and ability to supervise or control the infringing activity.

127.    Defendants MLBAM and/or FSM have a direct financial benefit from the activity descried herein.

20

128.    As a direct and proximate result, Plaintiff has incurred actual damages in the form of license fees while Defendants MLBAM and FSM have used Plaintiff's Copyrighted Photographs for their own commercial gain in an amount that will be determined at trial. Plaintiff may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each infringement of each copyright registration identified in **Exhibit A**, as available under the law.

### THIRD CLAIM FOR RELIEF VIOLATION OF DMCA
### 17 U.S.C. § 1202(b)
### (Against Defendants FSM and MLBAM)

129.    Plaintiff incorporates the allegations contained in the preceding paragraphs as if set forth at length here.

130.    Defendant intentionally removed or altered CMI knowing, or having reasonable grounds to know that the removal would aid infringement.

131.    Plaintiff is entitled to actual or statutory damages, at his election.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

A.    statutory damages in the amount of $150,000 per infringement for each Copyright Registration identified in the annexed **Exhibit A**, but in no case less than $30,000 with respect to each infringement, or for such other amount as may be proper pursuant to 17 U.S.C. § 504(c);

B.     for Plaintiffs' actual damage if Plaintiff so elects;

C.    Actual or statutory damages under the DMCA;

D.    attorneys' fees costs and disbursements in this action pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117; and,

E.      for such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated: February 14, 2016                          GARBARINI  FITZGERALD P.C.


                                    By:_____
                                       Richard M. Garbarini
                                       Richard M. Garbarini (RG 5496)
                                       250 Park Avenue
                                       7th Floor
                                       New York, New York 10177
                                       Telephone: (212) 300-5358
                                       Facsimile: (347) 218-9479